**Sanjay Wadhwa**
**Mark R. Zehner (not admitted in EDNY)**
**Charles D. Riely**
**Alexander M. Vasilescu**
**Ladan F. Stewart**
**Alison R. Levine**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0178 (Vasilescu)**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

———————————————————————— )
SECURITIES AND EXCHANGE ) 
COMMISSION, )
 )                    ECF CASE
                        Plaintiff, )
 )
            v. )
 )                    COMPLAINT AND
TOWN OF OYSTER BAY, NEW YORK, )     JURY DEMAND
and JOHN VENDITTO, )
 )
                        Defendants. )
———————————————————————— )

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Town of Oyster Bay, New York (the "Town") and John Venditto ("Venditto")

(collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     This action concerns Defendants' fraudulent omissions and misrepresentations in

failing to disclose to the investing public material information relating to the Town's indirect

guarantees of millions of dollars of private bank loans for the benefit of one of the Town's

concessionaires.  Defendants failed to disclose the indirect guarantees in connection with any of

the 26 securities offerings the Town issued between August 2010 and December 2015, and the

Town's eventual disclosures in connection with four securities offerings issued between December

2015 and December 2016 were materially misleading.  These offerings are listed in an appendix to

this Complaint.

2.      Between approximately June 2010 and June 2012, the Town agreed to indirectly

guarantee four private loans—totaling more than $20 million—for one of its long-standing

concessionaires who owned and operated restaurants and concessions located at several Town

facilities (the "Concessionaire" and such guaranteed loans, the "Concessionaire Loans").

3.      The unusual decision at the highest levels of the Town to go to such great lengths to

assist a vendor was a result of the Concessionaire's long and close relationship with Town and

Nassau County officials, which the Concessionaire had cultivated, in part, by providing various

forms of gifts, bribes, kickbacks, and political support to those officials.

4.      In the spring of 2010, in connection with the Concessionaire's first financing,

Defendants learned from the Town's outside counsel that the Town could not guarantee private

debt under the New York State Constitution.  At the direction of Venditto, the Town used a second

law firm to craft a solution to help the Concessionaire obtain private financing.  Venditto

personally met with outside counsel and other Town officials, as well as officials from Nassau

County including the Nassau County Executive, to push for such a solution.  Venditto and other

Town officials worked with outside counsel and ultimately developed a structure for the indirect

guarantee of the Concessionaire's financing that they believed to be binding and enforceable.

5.      In June 2010, the Town's Board passed a Resolution that approved this structure.

The Resolution was crafted to broadly cover financing relating to two of the Concessionaire's

Town facilities in order to "facilitate the Concessionaires' ability to obtain financing to make

capital improvements to the facilities."  Venditto voted in favor of this Resolution, and Venditto

and the Town Attorney also signed loan documents effectuating the indirect guarantee.

6.      Defendants subsequently agreed to indirectly guarantee three other private loans on

the Concessionaire's behalf in 2011 and 2012 using the same structure developed in 2010.

7.      In order to hide the unusual circumstances surrounding the indirect guarantees and

the associated liabilities, Defendants concealed the fact and nature of the indirect guarantees of the

Concessionaire Loans from prospective investors and investors in the Town's securities offerings,

as well as personnel, including Town officials and outside advisers, who assisted in preparing the

Town's securities offerings and financial statements.

8.      As a result, up until December 2015—when the Town disclosed the Concessionaire

Loans for the first time—the Town's securities offering documents and the appended financial

statements omitted any reference to the Town's indirect guarantees of those loans, thereby

presenting prospective investors, investors, rating agencies, underwriters, and others with a false

picture of the Town's financial condition and the quality of its management.

9.      In or about December 2015, after media reports on the indirect guarantees and the

Concessionaire's criminal indictment, Defendants finally disclosed the existence of the indirect

guarantees in the Town's securities offering documents, but those and subsequent disclosures

contained materially misleading statements about the indirect guarantees.

10.      By virtue of the conduct alleged herein:

        a.      The Town, directly or indirectly, singly or in concert, has engaged in acts,

practices, and courses of business that constitute violations of Section 17(a) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5]; and

      b.      Venditto, directly or indirectly, singly or in concert, has engaged in acts,

practices, and courses of business that constitute violations of Sections 17(a)(1) and

17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], and Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-

5]; is liable under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] as a controlling

person for the Town's violations of Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and aided and abetted (i) the

Town's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5], and (ii) the Town Attorney's violations of Sections 17(a)(1) and 17(a)(3) of

the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

      11.      Unless Defendants are permanently restrained and enjoined, they will again

engage in the acts, practices, and courses of business set forth in this Complaint and in acts,

practices, and courses of business of similar type and object.

<u>**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**</u>

      12.      The Commission brings this action under Section 20(b) of the Securities Act [15

U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]. The

Commission seeks to restrain and permanently enjoin Defendants from engaging in the acts,

practices, transactions and courses of business alleged in this Complaint. The Commission also

seeks conduct-based injunctions and relief against Defendants, including an order:

4

a.      Requiring the Town to retain a Court-appointed Independent Consultant to review and recommend improvements to the Town's financial reporting policies and controls, as well as the Town's municipal security disclosure policies and procedures and to monitor its mandated implementation of such recommendations for a period of five years;

b.      Prohibiting the Town, for a period five years, with such exceptions as may be reasonably approved by the Court, from engaging in the offer or sale of its own municipal securities unless, prior to doing so, it implements the recommendations of the Independent Consultant; and

c.      Prohibiting Venditto from participating in any offering of municipal securities, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any municipal securities.

13.     The Commission also seeks a final judgment ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  Finally, the Commission seeks any other equitable relief that the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the events constituting or giving rise to the alleged violations occurred in the Eastern District of New York.  For instance, the Town is located in Nassau County, New York.

## DEFENDANTS

16.     **The Town** is an incorporated municipal government in Nassau County.  The Town entered into agreements with the Commission to toll any applicable statute of limitations for the period July 19, 2017 through December 30, 2017.

17.     **Venditto**, age 68, resides in Massapequa, New York.  He was the Supervisor and Chief Executive Officer of the Town from approximately January 1998 through January 4, 2017. While he was the Supervisor, Venditto also served as the Treasurer and Chief Fiscal Officer of the Town, as well as the presiding member of the Town's Board.  Venditto invoked his Fifth Amendment right against self-incrimination and declined to testify before the Commission's staff.

## DEFENDANTS' VIOLATIVE CONDUCT

I.     **Summary of Defendants' Fraudulent Scheme**

18.     As detailed below, Defendants engaged in a scheme to defraud investors starting in approximately January 2010 and continuing through approximately December 2016.

19.     The scheme began when Defendants started to pursue avenues to assist the Concessionaire with his financing and continued through Defendants' decision to indirectly guarantee the Concessionaire Loans without disclosing the indirect guarantees to the Town's taxpayers or to the investing public.

20.     Defendants' conduct in pursuit of their fraudulent scheme included the following:

a.      convening a meeting at Venditto's offices with outside counsel, senior Town officials, and the Nassau County Executive, during which Venditto instructed outside counsel to find a way to help the Concessionaire obtain financing;

b.      intentionally drafting a Town Board Resolution in vague terms so as not to alert the public to the true purpose of the Resolution, which was for the Town to indirectly guarantee the Concessionaire's financing;

c.      intentionally drafting the amendments to the concession agreements in connection with the first two Concessionaire Loans in vague terms so as not to alert the public that the Town had an unconditional obligation to pay the Concessionaire's lender a termination payment tied directly to the loan amount;

d.      declining to seek further Town Board Resolutions in an effort to minimize public scrutiny of the subsequent indirect guarantees;

e.      failing to disclose the Concessionaire Loans to the Town's Comptroller's Office, despite knowing that the failure to disclose would cause the Comptroller's Office to make misrepresentations to the Town's external auditors, who had specifically requested information about the Town's contingent liabilities and debt guarantees;

f.      failing to timely disclose the Concessionaire Loans to the Town's Finance Division, which oversaw the Town's securities offerings, despite knowing that such failure to disclose would cause the Finance Department to make misrepresentations to the Town's municipal advisor, underwriters, rating agencies, and insurers, each of which specifically requested information about the Town's contingent liabilities and debt guarantees;

g.      failing to disclose the Concessionaire Loans to prospective investors and investors in 2015, even though by that time the Town had retained outside counsel to deal with the fallout of the loans including responding to a criminal investigation relating to the loans;

h.      continuing to mislead prospective investors and investors about the true circumstances surrounding the Concessionaire Loans through the Town's disclosures from December 2015 through approximately December 2016, as well as in discussions with investors, prospective investors, underwriters, rating agencies, insurers, and others; and

i.      making the false statements and omissions described herein.

II.    **The Concessionaire's Corrupt Relationship with Town Officials and the Nassau County Executive**

21.      The Concessionaire met Venditto and the Town Attorney in the 1990s, well before he was awarded his first Town concession, and provided them a series of personal benefits for many years.

22.      The Concessionaire provided Venditto as well as his friends and family members with free limousine services through a third-party vendor.  The Concessionaire also gave Venditto free or discounted meals at his restaurants, the free use of private office space at one of his restaurants along with free food and beverage services, and substantially discounted rates for events and fundraisers held at the Concessionaire's restaurants.

23.      The Concessionaire provided the Town Attorney and his family members with the free use of limousine services, free meals and beverages at the Concessionaire's restaurants, and substantial discounts for events held at those restaurants.  The Town Attorney also used the

private office space at one of the Concessionaire's restaurants along with free food and beverage services.

24.     The Concessionaire also paid for illegal personal benefits to the Nassau County Executive—and indirectly to Venditto—in connection with the Concessionaire Loans.

25.     In or about January 2010, the Concessionaire asked the Nassau County Executive to assist him with obtaining the Town's backing for the Concessionaire to obtain private financings.  The Nassau County Executive agreed to do so.  At or around the same time, the Concessionaire agreed to give the Nassau County Executive's wife a "no show" job that she held between approximately April 2010 and approximately August 2014, for which the Concessionaire paid her a total of approximately $450,000.

26.     The Nassau County Executive subsequently asked Venditto to assist the Concessionaire with obtaining financing for capital improvements to certain Town facilities, and Venditto agreed to help.  In exchange, Venditto arranged to provide a representative of the Nassau County Executive with a list of individuals affiliated with Venditto's political organization that Venditto wanted the Nassau County Executive to hire to positions within the Nassau County government.

27.     The Concessionaire also made a series of corrupt payments to an attorney employed by the Town Attorney's Office (the "Deputy Town Attorney") both before and after discussions concerning the Concessionaire Loans commenced.

28.     The Concessionaire had provided the Deputy Town Attorney and his family free meals at his restaurants for years and also provided him cash and other items of value, including but not limited to gift cards, home repairs, and a free family trip to Italy.

29.     This arrangement continued after the Concessionaire Loans—the Concessionaire

paid for several of the Deputy Town Attorney's vacations, including two trips to India as well as

trips to South Korea and Mexico between 2010 and 2012, and the Deputy Town Attorney

continued to eat for free at the Concessionaire's restaurants.

30.     In addition, the Concessionaire paid the Deputy Town Attorney a total of $50,000

(via checks written to "cash") in exchange for his help with the last two Concessionaire Loans.

Moreover, starting in or about September 2012 through approximately February 2015, the

Concessionaire paid the Deputy Town Attorney approximately $1,000 in cash, on a monthly

basis, to cover the Deputy Town Attorney's BMW car lease payments.

## III.     The Town's Indirect Guarantees of the Concessionaire Loans

31.     In or about 2000, the Town awarded its first concession agreement to the

Concessionaire to operate a food and beverage concession at the Town's Golf Course facility

(the "Golf Course Facility") for a period of 20 years, with an option to renew for another ten

years.  In or about 2005, the Town exercised the ten-year option, extending the concession

agreement for the Golf Course Facility through 2029.  In or about 2005, the Town entered into a

20-year concession agreement with the Concessionaire to operate food and beverage concessions

at the TOBAY Beach and Marina facility (the "TOBAY Beach Facility").  In or about 2008, the

Town further extended the concession agreements for both the Golf Course Facility and the

TOBAY Beach Facility (the "Facilities") by 20 years.

32.     Under the applicable concession agreements, the Concessionaire was obligated to

make certain capital improvements to the Facilities.

33.     In or about January 2010, the Concessionaire told the Nassau County Executive

that he needed financing to operate the Facilities and to complete the capital improvements

required by the terms of the concession agreements for the Facilities.  The Concessionaire

10

emphasized that the lenders he had approached had refused to provide financing without backing from the Town, which had AAA-rated credit at the time.

34.     The Nassau County Executive agreed to help the Concessionaire secure the financing.

35.     A few days later, on or about January 21, 2010, the Nassau County Executive approached Venditto at a political event, and later that evening, Venditto told the Concessionaire that the Nassau County Executive had spoken to Venditto about the financing and that Venditto would see what he could do to help the Concessionaire.

36.     Venditto then directed the Town Attorney to find a way for the Town to help the Concessionaire with the financing, and the Town Attorney, in turn, asked the Deputy Town Attorney to help the Concessionaire obtain financing.

### A.     The First Concessionaire Loan

37.     In or about February 2010, the Town Attorney and the Deputy Town Attorney asked the Town's outside counsel ("Outside Counsel 1"), to assist with providing the Town's backing to the Concessionaire.

38.     In or about March 2010, at Venditto's direction, the Deputy Town Attorney prepared a draft Resolution for the Town Board—the legislative body comprised of the Town Supervisor and several Board members—authorizing a guarantee of the Concessionaire's loans. He also circulated to various Town departments a memorandum "recommend[ing] that the Supervisor be authorized and directed to enter into a guaranty of payment and performance with the Concessionaire's bank, and an agreement with the Concessionaire regarding the use of loan proceeds at the Facilities."  The memorandum attached drafts of a "Guaranty of Payment and Performance" between the Town and a lender outlining the Town's "absolute, unconditional, present and continuing guaranty" of the Concessionaire's financing, as well as an agreement

11

between the Town and entities owned and operated by the Concessionaire (the "Concessionaire Entities" or, individually, a "Concessionaire Entity").

39.     On or about March 23, 2010, the Town Board adopted Resolution No. 256-2010 (the "March 2010 Resolution"), which provided that "the Supervisor is hereby authorized and directed to enter into an agreement with the Concessionaire's bank relating to the loan, and an agreement with the Concessionaire regarding the use of loan proceeds at the Facilities."  It further provided that the Concessionaire Entities had agreed to perform $6 million in additional capital improvements to the two Facilities, and that "in order to obtain financing for the proposed improvements, the Concessionaire's bank is requiring the Town to enter into an agreement relating to the loan."

40.     Venditto and six other Town Board members voted in favor of the March 2010 Resolution.

41.     In or about early April 2010, after reviewing the draft loan documents from the lender ("Lender 1") reflecting the guarantee, Outside Counsel 1 advised the Town Attorney and the Deputy Town Attorney that the Town could not legally guarantee the Concessionaire's loans to support his businesses because, among other things, the New York State Constitution prohibits municipalities from providing guarantees.  The Deputy Town Attorney communicated this message to the Concessionaire.

42.     The Concessionaire subsequently reached out to the Nassau County Executive for further help.  The Nassau County Executive then directed a law firm where he had previously worked ("Outside Counsel 2") to find a solution for the Concessionaire.  Outside Counsel 2 reached out to the Town Attorney to offer its assistance, and the Town Attorney then told the Deputy Town Attorney to get a second opinion from Outside Counsel 2.

43.     On or about April 28, 2010, Venditto hosted a meeting with Outside Counsel 1, Outside Counsel 2, and others at his offices to try to figure out a lawful way for the Town to guarantee the Concessionaire's financing.  The Town Attorney, the Deputy Town Attorney, the Nassau County Executive and his senior adviser, Venditto's senior adviser, and the Concessionaire also attended.

44.     The Nassau County Executive's attendance at this meeting was unusual and the group of Town officials at the meeting was intentionally kept small.

45.     At the meeting, Outside Counsel 1 again expressed concerns about the guarantee structure and advised that it was unlawful under Article VIII, Section 1 of the New York State Constitution for the Town to guarantee the Concessionaire's loans.  The group discussed the issue for approximately an hour and explored possible structures designed to address Outside Counsel 1's concerns.  At the conclusion of the meeting, Venditto directed Outside Counsel 2 to find a way to help the Concessionaire obtain financing.

46.     Following this April 2010 meeting, Outside Counsel 2 concluded that while the Town could not directly guarantee the loans, it could indirectly guarantee them by assigning a termination payment equal to the amount of the loans to the lender upon an event of default by the Concessionaire.

47.     On or about June 8, 2010, the Town Board adopted Resolution No. 605-2010 (the "June 2010 Resolution"), authorizing the Supervisor to execute amendments to the concession agreements for both the TOBAY Beach and Golf Course Facilities "as well as any other documents necessary to effectuate the purpose of this Resolution."  The June 2010 Resolution stated its purpose was "to facilitate the concessionaires' ability to obtain financing to make capital improvements to the facilities."  The June 2010 Resolution noted that the Concessionaire

Entities were required to make $8.2 million in capital improvements to the Golf Course Facility and $3.5 million in capital improvements to the TOBAY Beach Facility.

48.     The June 2010 Resolution was intentionally drafted vaguely so as not to highlight the indirect loan guarantee to the public.

49.     Venditto and five other Town Board members voted in favor of the June 2010 Resolution.

50.     On or about June 18, 2010, Lender 1 closed with a Concessionaire Entity a line of credit in the amount of $1.5 million for capital improvements to the TOBAY Beach Facility (the "First Concessionaire Loan").

51.     The line of credit was indirectly guaranteed by the Town.  This indirect guarantee was accomplished through an amendment, dated on or about June 9, 2010, to the Town's previously existing concession agreement with the Concessionaire Entity (the "First Loan Amendment"), as well as a separate three-party assignment agreement, dated on or about June 18, 2010 (the "First Loan Assignment") (together, the "First Concessionaire Loan Documents").

52.     The First Loan Amendment provided that the Concessionaire had made capital improvements to the TOBAY Beach Facility valued at approximately $1.8 million.  It also provided that a default by the Concessionaire Entity under its "credit facility" with Lender 1 would constitute an event of default under the concession agreement, and further provided:  "If the Town terminates the [Concession] Agreement for any reason prior to April 30, 2015, the Town shall pay [the Concessionaire Entity] a termination payment . . . [of] $1,500,000."

53.     The First Loan Amendment did not state that the "credit facility" with Lender 1 was for $1.5 million, or that the $1.5 million termination payment was specifically tied to the amount of the credit facility.

54.     Through the First Loan Assignment, executed by Lender 1, the Concessionaire Entity, and the Town, the Concessionaire Entity assigned to Lender 1 its rights to receive this termination payment from the Town.  The First Loan Assignment further provided:  "[The Concessionaire Entity] and [the Town] expressly agree that a Default Notice received by [the Town] from [Lender 1] without further or additional notice from [the Town] to [the Concessionaire Entity], shall be deemed a default under the Concession Agreement thereby triggering [Lender 1's] right to the [termination] payments."  It also provided:  "Within five (5) business days after receipt by [the Town] of a notice with certification by [Lender 1] that an Event of Default which remains uncured . . . under the Line of Credit . . . [the Town] shall pay any amounts due . . . to [the Concessionaire Entity] under the Concession Agreement . . . to [Lender 1]."

55.     Venditto signed the First Loan Amendment on behalf of the Town on or about June 8, 2010.

56.     The Deputy Town Attorney signed the First Loan Amendment as the Deputy Town Attorney who had reviewed the agreement.

57.     The Town Attorney signed the First Loan Assignment on behalf of the Town on or about June 18, 2010.

58.     On or about June 17, 2010, the Deputy Town Attorney executed an opinion letter on behalf of the Town Attorney's Office stating, among other things, that the Town "has full power and authority to execute the [First Concessionaire Loan Documents] and to perform its obligations thereunder" and that the First Concessionaire Loan Documents were "duly authorized, executed and delivered by the Town and are binding on and enforceable against the Town. . . ."

59.     The indirect guarantee structure devised by the Town and its outside counsel changed significantly the nature of the Town's obligations under the concession agreement.  The Concessionaire's original concession agreement with the Town provided that the the Town would make a termination payment to the Concessionaire Entity (calculated based on the value of the capital improvements) in the event the Town decided to terminate the concession agreement "without cause"—a step the Town reasonably would take only if doing so would be financially advantageous, for example if it had already lined up a more lucrative deal with another concessionaire.  The First Concessionaire Loan Documents, on the other hand, obligated the Town to make a termination payment immediately upon a "with cause" termination of the agreement triggered by the Concessionaire's default on his loan.

### B.     The Second Concessionaire Loan

60.     As contemplated by the language of the June 2010 Resolution, Town officials continued working with the Concessionaire on obtaining an additional loan related to the Golf Course Facility.

61.     Indeed, at the same time he signed documents relating to the First Concessionaire Loan for TOBAY Beach, Venditto also signed at least one amendment related to the concession agreement for the Golf Course Facility that provided for the Town's indirect guarantee of financing for that facility, although the Concessionaire had not finalized financing with a lender at that time.

62.     This time, the Concessionaire sought an additional larger loan of more than $3 million from Lender 1, bringing the total amount to nearly $5 million.  As a result, Lender 1 requested an independent opinion letter from the Town's outside counsel stating that the Town had the right to support this credit.

63.     The Deputy Town Attorney subsequently engaged a law firm ("Outside Counsel 3") to represent the Town.  On or about September 21, 2010, Outside Counsel 3 provided an opinion of counsel letter which stated, in part:  "The Town is duly authorized to execute the proposed Amendment to Concession Agreement and Default Assignment of Concession Agreement Proceeds and upon execution thereof, said Agreements will be enforceable against the Town in accordance with their terms."

64.     After months of additional negotiations, on or about May 25, 2011, Lender 1 and two of the Concessionaire Entities closed a loan in the amount of $3.4 million (the "Second Concessionaire Loan").

65.     Similar to the structure of the First Concessionaire Loan, the Town agreed to indirectly guarantee the Second Concessionaire Loan through an amendment, dated on or about May 25, 2011, to the Town's concession agreement for the Golf Course Facility (the "Second Loan Amendment") and a separate three-party assignment agreement, dated on or about May 25, 2011 (the "Second Loan Assignment") (together, the "Second Concessionaire Loan Documents").

66.     Other than the amount of the termination payment, the material terms of the Second Concessionaire Loan Documents were substantially similar to the First Concessionaire Loan Documents.

67.     The Second Loan Amendment provided that the Concessionaire had made capital improvements to the TOBAY Beach Facility valued at approximately $4.95 million.  It also provided that a default by the Concessionaire Entity under its "credit facility" with Lender 1 would constitute an event of default under the concession agreement, and further provided:  "If

17

the Town terminates the [Concession] Agreement for any reason prior to December 31, 2025, the Town shall pay [the Concessionaire Entity] a termination payment . . . [of] $3,400,000."

68.     The Second Loan Amendment did not state that the "credit facility" with Lender 1 was for $3.4 million, or that the $3.4 million termination payment was specifically tied to the amount of the credit facility.

69.     Through the Second Loan Assignment, executed by Lender 1, the Concessionaire Entity, and the Town, the Concessionaire Entity assigned to Lender 1 its rights to receive this termination payment from the Town.  The Second Loan Assignment further provided:  "[The Concessionaire Entity] and [the Town] expressly agree that a Default Notice received by [the Town] from [Lender 1] without further or additional notice from [the Town] to [the Concessionaire Entity], shall be deemed a default under the Concession Agreement thereby triggering [Lender 1's] right to the [termination] payments."  It also provided:  "Within five (5) business days after receipt by [the Town] of a notice with certification by [Lender 1] that an Event of Default which remains uncured . . . under the Line of Credit . . . [the Town] shall pay any amounts due . . . to [the Concessionaire Entity] under the Concession Agreement . . . to [Lender 1]."

70.     The Town Attorney signed both the Second Loan Amendment and the Second Loan Assignment on behalf of the Town on or about May 5, 2011.

71.     The Town Attorney was authorized to sign these agreements on behalf of the Town because on or about November 23, 2010, the Town Board adopted Resolution No. 1125-2010, which authorized the Town Attorney to perform the functions and duties of the Town Supervisor in the event the Supervisor was absent or unavailable, including signing contracts and any other documentation necessary to facilitate the responsibilities of the Supervisor.

18

72.     Venditto regularly caused the Town Attorney to sign documents on behalf of the Town.

73.     The Deputy Town Attorney signed the Second Loan Amendment as the Deputy Town Attorney who had reviewed the agreement.

74.     The Deputy Town Attorney also executed an opinion of counsel letter on or about May 6, 2011, which was substantially similar to the opinion letter he provided in connection with the First Concessionaire Loan, stating, among other things, that the Town "has full power and authority to execute the [Second Concessionaire Loan Documents] and to perform its obligations thereunder" and that the Second Concessionaire Loan Documents were "duly authorized, executed and delivered by the Town and are binding on and enforceable against the Town . . . ."

75.     The Town Attorney met with the Deputy Town Attorney and the Concessionaire several times before the Second Concessionaire Loan closed.  The Town Attorney knew that the Concessionaire was negotiating with Lender 1 to procure a loan for the Golf Course Facility, and that the loan would be indirectly guaranteed by the Town.  The Town Attorney further knew that the Concessionaire was initially looking for approximately $5 million in financing in total for the TOBAY Beach and Golf Course Facilities.  The Town Attorney therefore knew about, or recklessly disregarded, the Town's indirect guarantee of the Second Concessionaire Loan.

76.     Venditto was very involved in 2010 in securing financing for the Concessionaire for both the TOBAY Beach and Golf Course Facilities.  Venditto authorized the June 2010 Resolution which contemplated the Town's indirect guarantee of financing relating to the Golf Course Facility, and in or about June 2010, Venditto signed at least one amendment to the concession agreement for the Golf Course Facility that reflected the Town's indirect guarantee of the Concessionaire's financing.  Venditto was kept apprised of developments relating to the

Second Concessionaire Loan.  Venditto therefore knew, or recklessly disregarded, that the Town indirectly guaranteed the Second Concessionaire Loan.

### C.    The Third Concessionaire Loan

77.    In or about January 2011, the Concessionaire and the Town began discussions with another lender ("Lender 2") regarding additional financing for both the Golf Course and TOBAY Beach Facilities.

78.    From the start of the discussions, Lender 2 insisted that any financing would require the Town's backing.

i.    August 2011 Meeting with Town Officials

79.    The Deputy Town Attorney led the negotiations with Lender 2 on behalf of the Town and repeatedly assured Lender 2 that the Town would stand behind the financing.  Lender 2, however, insisted on meeting with representatives from the Town in addition to the Deputy Town Attorney in order to confirm the Town's commitment to back the Concessionaire's financing.

80.    The Deputy Town Attorney worked with the Town Attorney to arrange such a meeting.  In a meeting with the Deputy Town Attorney and the Concessionaire on or about August 1, 2010, the Town Attorney agreed that Town officials should meet with Lender 2's representatives.

81.    The next day, the Deputy Town Attorney emailed three senior Town officials— the Executive Assistant to the Supervisor, the Deputy Commissioner of Parks, and the Deputy Comptroller—to seek their participation in the meeting.

82.    The Executive Assistant to the Supervisor was selected to attend the meeting specifically because Lender 2 wanted to meet with the Supervisor (Venditto), and the Executive Assistant to the Supervisor attended on Venditto's behalf.

83.     The Deputy Town Attorney's email to the senior Town officials noted that the Town Attorney had approved the meeting, and that the Concessionaire was "looking to secure financing for various capital improvements to the two [Town] facilities" and that "[t]he financing entity has requested a meeting with various Town representatives to verify certain aspects of the concession operation, and the Town's support for the improvements."

84.     The Deputy Town Attorney asked Lender 2 for a summary of the proposed deal so he could "brief the attendees before the meeting, and make the meeting more productive."

85.     Lender 2 subsequently sent the Deputy Town Attorney a term sheet, which included the loan amount and specified that "[t]he funding is conditioned upon a contractual obligation from the Town" in which the Town agrees to "financially support Borrower's repayment obligations, in a form acceptable to Lender" and that the Town's "obligation . . . shall be absolute and unconditional with no offsets whatsoever."

86.     This term sheet was distributed to the meeting participants.

87.     On or about August 10, 2011, the three senior Town officials met with three individuals representing Lender 2 at Town Hall.  The Deputy Town Attorney and the Concessionaire were also present.

88.     The participants discussed the structure of the indirect guarantee, including that the Town's indirect guarantee would function through an amendment to the concession agreement, with the Town being obligated to make a payment to Lender 2 if it received notice that the Concessionaire was late on his loan payments.

89.     The participants also discussed the Town's positive relationship with the Concessionaire, the capital improvements completed by the Concessionaire, the new

improvements the Concessionaire sought to make to the Facilities, the Town's willingness to assist the Concessionaire with additional financing, and the amount of the proposed financing.

90.     Lender 2 made it clear during this meeting that it was looking for assurances about the Town's commitment to the Concessionaire and its willingness to back the Concessionaire in connection with the loan.  The Executive Assistant to the Supervisor, on behalf of the Supervisor, assured Lender 2 of the Town's backing.

ii.     Terms of the Third Concessionaire Loan

91.     After the August 2011 meeting, the Deputy Town Attorney worked with Lender 2 and the institutional investor to which Lender 2 assigned its rights under the agreements with the Concessionaire (the "Investor"), to finalize the transaction.

92.     The Deputy Town Attorney re-engaged Outside Counsel 3 (who had assisted with the Second Concessionaire Loan) in connection with this financing, and Outside Counsel 3 participated in virtually all negotiations with Lender 2 and the Investor.  The Investor was also represented by outside counsel in the negotiations.

93.     Lender 2 and the Investor initially required a more direct guarantee structure such that in the event of the Concessionaire Entity's default on its loan with Lender 2, the Town would be obligated to pay to Lender 2 the amount outstanding on the loan.

94.     After extensive negotiations, the parties agreed to revise the structure such that a default by the Concessionaire would automatically trigger a termination under the concession agreement, which would obligate the Town to make a termination payment to the Concessionaire Entity, and the Concessionaire Entity would then assign the payment to Lender 2 and the Investor.

95.     This structure was similar to the structure devised by the Town and Outside Counsel 2 in 2010—which was intended to ensure that the guarantee was indirect and therefore not in violation of the New York State Constitution.

96.     Outside Counsel 3, along with outside counsel for the Investor, agreed that this structure was not an unconstitutional guarantee of debt and was legal and enforceable.

97.     Lender 2 initially requested that the Town Board adopt a new Resolution approving the financing.

98.     However, the Town, including through the Town Attorney and the Deputy Town Attorney, determined that the June 2010 Resolution was broad enough to cover the Lender 2 financing.

99.     The Deputy Town Attorney communicated this message to Lender 2 and the Investor, and Lender 2 and the Investor agreed to rely on the June 2010 Resolution.

100.    The Deputy Town Attorney provided a certified copy of the June 2010 Resolution to Lender 2 and the Investor.

101.    The parties relied on the June 2010 Resolution as providing the requisite authority by the Town for the Town's indirect guarantee of the Third Concessionaire Loan.

102.    On or about November 18, 2011, Lender 2 and the Concessionaire Entity closed a loan for $7.8 million inclusive of interest relating to the Golf Course Facility (the "Third Concessionaire Loan").

103.    As with the First Concessionaire Loan and the Second Concessionaire Loan, the Town's indirect guarantee was accomplished through an amendment, dated on or about November 18, 2011, to the concession agreement (the "Third Loan Amendment"), as well as a

separate three-party assignment agreement, dated on or about November 18, 2011 (the "Third Loan Assignment") (together, the "Third Concessionaire Loan Documents").

104.     The Third Loan Amendment provided that "in order to induce [Lender 2] to provide such financing [to the Concessionaire Entity], and in consideration of the benefits the Town has and will continue to receive from the previous and proposed capital improvements, the Town has agreed to amend the [Concession] Agreement to provide for payment of certain amounts under the [Concession] Agreement to [Lender 2] should [the Concessionaire Entity] default in its obligations to [Lender 2]."  It further provided that a default by the Concessionaire Entity of its obligations to Lender 2 would constitute an event of default under the concession agreement, and that upon such default, the concession agreement "shall be deemed terminated by the Town without further notice to [the Concessionaire Entity]" and that the Town would be obligated "to pay the Termination Payment to [Lender 2], in one lump sum, within sixty (60) days following receipt of notice by [Lender 2] to the Town of such Event of Default. . . ."

105.     Through the Third Loan Assignment, executed by Lender 2, the Concessionaire Entity, and the Town, the Concessionaire Entity assigned to Lender 2 its rights to receive this termination payment from the Town.  In the Third Loan Assignment, the Town acknowledged that "it has and will receive substantial municipal benefit from [the Concessionaire Entity's] performance under the Concession Agreement."  The Third Loan Assignment also provided "that it is the [the Town's] intention to fulfill its payment obligation hereunder by issuing one or more bonds."

106.     The Third Loan Amendment and the Third Loan Assignment were both signed by the Town Attorney on behalf of the Town on or about November 18, 2011.

107.    The Deputy Town Attorney signed the Third Loan Amendment and the Third Loan Assignment as the Deputy Town Attorney who had reviewed and approved the agreements.

108.    Outside Counsel 3 executed an opinion of counsel letter on or about November 16, 2011, in its capacity as counsel to the Town, providing that the Third Concessionaire Loan Documents "have been duly authorized by all necessary action of [the Town] and have been duly executed and delivered by [the Town]," and that they are "are the valid binding obligations of [the Town], enforceable in accordance with their respective terms by [Lender 2] and its successors and assigns."

109.    The Deputy Town Attorney provided an opinion of counsel letter on or about November 18, 2011, similarly providing that the Third Concessionaire Loan Documents "have been duly authorized by all necessary action of [the Town] and have been duly executed and delivered by [the Town]," and that they are "are the valid binding obligations of [the Town], enforceable in accordance with their respective terms by [Lender 2] and its successors and assigns."

**D.    The Fourth Concessionaire Loan**

110.    The Town again agreed to provide an indirect guarantee in connection with a second loan from Lender 2 relating to the TOBAY Beach Facility.

111.    The negotiations relating to this deal began in or about December 2011 and were relatively straight-forward, as the transaction largely mirrored the Third Concessionaire Loan.

112.    Once again, Outside Counsel 3 acted as outside counsel to the Town, and the Investor was also represented by outside counsel.

113.    The loan facility for approximately $12.3 million inclusive of interest closed on or about June 22, 2012 (the "Fourth Concessionaire Loan").

25

114.    As with the Third Concessionaire Loan, the parties relied on the June 2010 Resolution as providing the requisite authority by the Town for the Town's indirect guarantee of the Fourth Concessionaire Loan.  Once again, the Deputy Town Attorney provided a certified copy of the June 2010 Resolution to Lender 2 and the Investor.

115.    As with all three of the prior Concessionaire Loans, the Town's indirect guarantee was accomplished through an amendment, dated on or about June 22, 2012, to the concession agreement (the "Fourth Loan Amendment"), as well as a separate three-party assignment agreement dated on or about June 22, 2012 (the "Fourth Loan Assignment") (together, the "Fourth Concessionaire Loan Documents").

116.    The Fourth Concessionaire Loan Documents were substantially similar to the documents signed in connection with the Third Concessionaire Loan.

117.    The Fourth Loan Amendment provided that "in order to induce [Lender 2] to provide such financing [to the Concessionaire Entity], and in consideration of the benefits the Town has and will continue to receive from the previous and proposed capital improvements, the Town has agreed to amend the [Concession] Agreement to provide for payment of certain amounts under the [Concession] Agreement to [Lender 2] should [the Concessionaire Entity] default in its obligations to [Lender 2]."  It further provided that a default by the Concessionaire Entity of its obligations to Lender 2 would constitute an event of default under the concession agreement, and that upon such default, the concession agreement "shall be deemed terminated by the Town without further notice to [the Concessionaire Entity]" and that the Town would be obligated "to pay the Termination Payment to [Lender 2], in one lump sum, within sixty (60) days following receipt of notice by [Lender 2] to the Town of such Event of Default. . . ."

118.    Through the Fourth Loan Assignment, executed by Lender 2, the Concessionaire Entity, and the Town, the Concessionaire Entity assigned to Lender 2 its rights to receive this termination payment from the Town.  In the Fourth Loan Assignment, the Town acknowledged that "it has and will receive substantial municipal benefit from [the Concessionaire Entity's] performance under the Concession Agreement."  The Fourth Loan Assignment also provided "that it is the [the Town's] intention to fulfill its payment obligation hereunder by issuing one or more bonds."

119.    The Fourth Loan Amendment and the Fourth Loan Assignment were each signed by the Town Attorney on behalf of the Town on or about June 19, 2012.

120.    On or about June 22, 2012, the Town Attorney also signed on behalf of the Town a separate "cross-default letter," which linked the Golf Course and TOBAY Beach concession agreements such that a default by the Concessionaire in one would cause a default in the other, thus obligating the Town to make a termination payment.

121.    The Deputy Town Attorney signed the Fourth Loan Amendment and the Fourth Loan Assignment as the Deputy Town Attorney who had reviewed and approved the agreements.

122.    Outside Counsel 3 executed an opinion of counsel letter on or about June 21, 2012, in its capacity as counsel to the Town, providing that the Fourth Concessionaire Loan Documents "have been duly authorized by all necessary action of [the Town] and have been duly executed and delivered by [the Town]," and that they are "are the valid binding obligations of [the Town], enforceable in accordance with their respective terms by [Lender 2] and its successors and assigns."

123.    The Deputy Town Attorney provided an opinion of counsel letter on or about June 22, 2012, similarly providing that the Fourth Concessionaire Loan Documents "have been

27

duly authorized by all necessary action of [the Town] and have been duly executed and delivered by [the Town]," and that they are "are the valid binding obligations of [the Town], enforceable in accordance with their respective terms by [Lender 2] and its successors and assigns."

>    **E.     Senior Town Officials, Including Venditto, Knew About, or Recklessly Disregarded, the Town's Indirect Guarantees of the Third Concessionaire Loan and the Fourth Concessionaire Loan**

124.    A number of senior Town officials, including Venditto, knew about, or recklessly disregarded, the Third Concessionaire Loan and the Fourth Concessionaire Loan and the Town's indirect guarantees of those loans.

125.    The Town Attorney knew, or recklessly disregarded, that the Town indirectly guaranteed the Third Concessionaire Loan and the Fourth Concessionaire Loan:

>    a.    The Town Attorney signed all of the Third Concessionaire Loan Documents and the Fourth Concessionaire Loan Documents, and separately signed a cross-default letter in connection with the Fourth Concessionaire Loan.

>    b.    The Town Attorney knew in 2011 and 2012 that the Concessionaire was seeking additional financing for improvements to the TOBAY Beach and Golf Course Facilities—separate and apart from the Lender 1 financing—and that the Concessionaire needed the Town's backing for this financing.

>    c.    The Town Attorney knew that the Town would be obligated to pay if the Concessionaire defaulted on his financing.

>    d.    The Town Attorney met with the Concessionaire on numerous occasions to discuss the Concessionaire's planned capital improvements and the need for financing in the spring and summer of 2011.

e.      On or about August 1, 2011, the Town Attorney met with the Deputy

Town Attorney and the Concessionaire to discuss Lender 2's request for a meeting with

senior Town officials.  The Town Attorney approved this meeting.

f.      The Concessionaire and the Town Attorney continued to meet in the fall

of 2011, before the Third Concessionaire Loan closed, including a meeting on or about

October 18, 2011, where they discussed the Town Attorney signing the Third

Concessionaire Loan Documents.

g.      Similarly, the Deputy Town Attorney and the Concessionaire met with the

Town Attorney to discuss the Fourth Concessionaire Loan on multiple occasions starting

in late 2011 and continuing in 2012.

126.    The Executive Assistant to the Supervisor knew, or recklessly disregarded, that

the Town indirectly guaranteed the Third Concessionaire Loan and the Fourth Concessionaire

Loan:

a.      The Executive Assistant to the Supervisor, along with the Deputy

Commissioner of Parks and the Deputy Comptroller, attended a meeting with Lender 2 in

or about August 2010 where they learned that the Concessionaire's lender was requiring

that the Town backstop the Concessionaire's financing through an amendment to the

concession agreement, as well as the amount of the financing.

b.      In or about April 2013, the Executive Assistant to the Supervisor and the

Commissioner of the Department of Public Works attended another meeting with Lender

2's representatives in connection with the Concessionaire's efforts to get an additional

$10 million financing for a different Town concession (which ultimately was

unsuccessful).  At this meeting, Lender 2 referenced the almost $20 million in indirect

guarantees that the Town had already made to the Concessionaire.  Both senior Town

officials indicated that the Town stood behind the Concessionaire.

127.    The Deputy Town Attorney knew, or recklessly disregarded, that the Town

indirectly guaranteed the Third Concessionaire Loan and the Fourth Concessionaire Loan:

      a.    The Deputy Town Attorney led the negotiations with Lender 2 and

Investor on behalf of the Town, and attended all meetings and conference calls on behalf

of the Town.

      b.    The Deputy Town Attorney signed the Second Concessionaire Loan

Documents and the Third Concessionaire Loan Documents.

128.    Venditto knew, or recklessly disregarded, that the Town indirectly guaranteed the

Third Concessionaire Loan and the Fourth Concessionaire Loan.

129.    Venditto was apprised of the circumstances surrounding the Third Concessionaire

Loan and the Fourth Concessionaire Loan by other Town officials.

130.    The Town Attorney, who, in his capacity as Deputy Supervisor, managed the day-

to-day activities of the Town on Venditto's behalf, had a practice of keeping Venditto apprised

of all relevant Town events.  Venditto and the Town Attorney also had a close personal

relationship, with Venditto serving as the Town Attorney's mentor.

131.    The Town Attorney knew about the Third Concessionaire Loan and the Fourth

Concessionaire Loan, and reported to Venditto about those loans.

132.    The Executive Assistant to the Supervisor attended as Venditto's representative

two meetings with Lender 2 where the Town's indirect guarantee and the amount of the

financing the Concessionaire sought (or had already received) from Lender 2 were discussed.

133.    Venditto knew, or recklessly disregarded, that the Concessionaire planned to perform capital improvements at the Facilities in 2011 and June 2012.  Based in part on his involvement in securing financing for the Concessionaire in 2010, Venditto knew, or recklessly disregarded, that the Town would have to indirectly guarantee the Concessionaire's financing.

IV.    **Defendants' Material Misstatements and Omissions**

A.    **Misstatements and Omissions Between June 2010 and December 2015**

134.    The Town did not disclose the substance or nature of the Town's indirect guarantees of the Concessionaire Loans in connection with any of the 26 securities offerings the Town issued between June 2010 and December 2015.  These offerings are set forth in an appendix to this Complaint.

135.    For each of these 26 securities offerings, the Town prepared offering documents (preliminary official statements and official statements), which omitted any reference to the Town's indirect guarantees of the Concessionaire Loans.

136.    The Town's audited financial statements for fiscal years 2010 through 2013, which, as outlined in the appendix to this Complaint, were attached to the Town's offering documents from approximately August 2011 through February 2016, also omitted any reference to the Town's indirect guarantees of the Concessionaire Loans.

137.    The Town provided these offering documents and appended audited financial statements to prospective investors, investors, rating agencies, insurance companies, and underwriters, each of whom relied upon the information contained therein to make investment, rating, pricing, and other significant decisions relating to the Town's securities offerings.

138.    Defendants knew about the Town's indirect guarantees of the Concessionaire Loans, but did not disclose their existence to the Town's Comptroller's Office, which prepared

31

the Town's financial statements, or to the Town's Finance Division, which prepared the Town's

securities offering documents.

139.    Similarly, Defendants did not disclose the Town's indirect guarantees of the

Concessionaire Loans to the Town's external auditors or external accounting consultants, or to

the external financial, legal, or other advisers who assisted with the preparation of the Town's

securities offering documents.

140.    Instead, in connection with preparing the Town's securities offerings issued

between June 2010 and December 2015, and/or in connection with preparing the Town's

financial statements for fiscal years 2010 through 2013, the Town falsely represented to auditors,

accounting consultants, municipal advisors, rating agencies, insurers, and underwriters that the

Town did not have any undisclosed contingent liabilities, guarantees of debt, bank loans, or

pending or anticipated litigation, that could materially affect the Town's financial condition.

141.    For example, the Town's Comptroller's Office signed management representation

letters to the Town's auditors in connection with the audit of the financial statements for fiscal

years 2010 through 2013, certifying, among other things, that:

a.      The financial statements had been presented in accordance with U.S.

generally accepted accounting principles ("GAAP");

b.      All material transactions have been recorded in the accounting records and

are reflected in the underlying the financial statements;

c.      "Guarantees, whether written or oral, under which the Town is

contingently liable," were properly recorded or disclosed in the financial statements; and

      d.     There were no unasserted legal claims or assessments or other possible litigation or additional liabilities or gain or loss contingencies that were required to be accrued or disclosed by GAAP.

142.    Similarly, in connection with each of the Town's securities offerings, the Town's Director of Finance signed due diligence questionnaires representing to the Town's municipal advisor that the Town had disclosed all information that could materially affect the Town's financial condition, including "off-balance sheet liabilities or leases, installment purchase agreement or similar arrangements," as well as threatened or pending litigation or controversies against the Town that could have a material adverse impact on the financial condition of the Town.

143.    As a result of Defendants' failure to disclose the indirect guarantees of the Concessionaire Loans, the Town's audited financial statements for fiscal years 2010 through 2013 omitted any reference to the Concessionaire Loans or the Town's indirect guarantees of the Concessionaire Loans.

144.    Therefore, the Town's audited financial statements for fiscal years 2010 through 2013, which were appended to the Town's securities offering documents from August 2011 through February 2016, contained material omissions that rendered the statements in the financial statements misleading, including but not limited to statements relating to the Town's indebtedness, contingent liabilities, and/or litigation.

145.    In addition, the Town's financial statements for fiscal years 2010 through 2013 each represented that the financial statements were prepared in conformity with GAAP.  GAAP required disclosure of the Town's indirect guarantees of the Concessionaire Loans.  Therefore,

the Town's audited financial statements for fiscal years 2010 through 2013 each contained material misstatements relating to GAAP compliance.

146.    Similarly, as a result of Defendants' failure to disclose the indirect guarantees of the Concessionaire Loans, the Town sent to prospective investors and investors preliminary official statements and official statements in connection with each of the 26 securities offerings from June 2010 through August 2015, which omitted any reference to the Concessionaire Loans or the Town's indirect guarantees of the Concessionaire Loans.

147.    Therefore, the Town's preliminary official statements and official statements from June 2010 through August 2015 contained material omissions that rendered the statements in the documents misleading, including but not limited to statements relating to the Town's indebtedness, contingent liabilities, and/or litigation.

148.    Venditto knowingly, or with reckless disregard, signed each of the Town's preliminary official statements and official statements for these 26 offerings, which noted that "the Town will furnish a certificate that as of the date of the Official Statement, [it] did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements herein, in light of the circumstances under which they were made, not misleading."  At the time Venditto signed each of these documents, Venditto knew, or recklessly disregarded, that the Town had not disclosed the indirect guarantees of the Concessionaire Loans in its offering documents.

149.    Venditto also knowingly, or with reckless disregard, signed, or caused the Town Attorney to sign, certifications for each of these offerings, which falsely stated that the offering documents did not contain any material misstatements or omissions.  At the time Venditto signed, or caused the Town Attorney to sign, each of these documents, Venditto knew, or

recklessly disregarded, that the Town had not disclosed the indirect guarantees of the

Concessionaire Loans in its offering documents.  Similarly, at the time the Town Attorney signed

each of these documents, the Town Attorney knew, or recklessly disregarded, that the Town had

not disclosed the indirect guarantees of the Concessionaire Loans in its offering documents.

150.    Venditto also knowingly, or with reckless disregard, signed, or caused the Town

Attorney to sign, bond purchase agreements in connection with certain of these offerings which

represented to the underwriter that the preliminary official statement and official statement did

not contain any untrue statement of material fact or any omission.  At the time Venditto signed,

or caused the Town Attorney to sign, each of these documents, Venditto knew, or recklessly

disregarded, that the Town had not disclosed the indirect guarantees of the Concessionaire Loans

in its offering documents.  Similarly, at the time the Town Attorney signed each of these

documents, the Town Attorney knew, or recklessly disregarded, that the Town had not disclosed

the indirect guarantees of the Concessionaire Loans in its offering documents.

151.    For example, as part of the closing of the Town's issue of Public Improvement

Refunding (Serial) Bonds, on or about April 24, 2014, Venditto signed, among other things, the

following documents:

        a.      A "Certificate of the Supervisor," stating that the "Preliminary Official

        Statement of the Town dated March 26, 2014 . . ., as of the date hereof does not contain

        any untrue statements of material fact or omit to state a material fact necessary to make

        the statements made therein, in light of the circumstances under which they were made,

        not misleading."  It further stated that the "Final Official Statement of the Town dated

        April 2, 2014 . . ., as of the date hereof, does not contain any untrue statement of a

material fact or omit to state a material fact necessary to make the statements made

therein, in light of the circumstances under which they were made, not misleading."

        b.     A "Certificate as to Official Statement" stating that "the Official Statement

did not contain any untrue statements of a material fact or omit to state a material fact

necessary to make the statements therein, in light of the circumstances under which they

were made, not misleading."

        c.     A Bond Purchase Agreement, entered into with an underwriter, stating that

the "information contained in the Final Official Statement (including the financial

statements and other financial and statistical data included therein) is, and as of the

Closing Date will be, true and correct and does not and will not contain any untrue or

incorrect statement or misleading statement of a material fact and does not and will not

omit to state a material fact necessary in order to make the statements made therein, in

light of the circumstances under which they were made, not misleading."

152.    Defendants also did not disclose the Town's indirect guarantees of the

Concessionaire Loans to the rating agencies, which rated the Town's credit and the securities

being offered, based upon the information the Town provided to them, including in draft offering

documents, financial statements, and responses to due diligence questionnaires.  Rating agencies

specifically asked the Town to disclose all relevant financial and other information, including all

debt-like obligations such as contingent liabilities and bank loans.

153.    Similarly, Defendants did not disclose the Town's indirect guarantees of the

Concessionaire Loans to insurance companies, which decided whether to insure certain of the

Town's securities offerings based upon the information the Town provided to them, including in

draft official statements, financial statements, and in response to specific diligence questions.  An

insurance company that insured several of the Town's bonds specifically asked the Town to disclose all debt obligations.

154.    As a result of Defendants' failure to disclose information about the Town's indirect guarantees of the Concessionaire Loans to the rating agencies or insurance companies, either directly or through the Town's preliminary offering documents and financial statements, the Town's underlying credit ratings and/or the ratings of the securities being issued by the Town did not reflect the Town's indirect guarantees of the Concessionaire Loans.

155.    The last two securities offerings made by the Town before information about the Concessionaire Loans was finally disclosed by Defendants occurred on or about May 13, 2015 and June 25, 2015.

156.    By the time of both of those offerings:  (a) Defendants knew that the U.S. Attorney's Office for the Eastern District of New York ("USAO") was conducting a criminal investigation relating to the Concessionaire Loans; (b) the Town had retained outside counsel to conduct an internal investigation relating to the Concessionaire Loans; and (c) the Town was in discussions with Lender 2 and the Investor regarding the Town's obligations under the Third Concessionaire Loan and the Fourth Concessionaire Loan.

157.    In addition, by the time of the June 25, 2015 offering:  (a) the Town had sent letters (on or about June 16, 2015) to the Concessionaire, Lender 2, and the Investor stating that the Loan Documents in connection with the Third Concessionaire Loan and the Fourth Concessionaire Loan are "null and void" because, among other reasons, "they each purport to make the Town a guarantor of the Concessionaire's loan, which violates Article VIII, §1 of the New York State Constitution, and neither was authorized by a Town Board Resolution, as required under New York State Town Law § 64(6)"; and (b) the Investor had filed (on or about

June 22, 2015) a notice of claim against the Town in connection with the Third Concessionaire Loan and the Fourth Concessionaire Loan.

158.    Although Defendants and other senior Town officials knew about the Concessionaire Loans and were anticipating litigation with the lenders by the time of the May 13, 2015 and June 25, 2015 offerings, Defendants failed to disclose the Concessionaire Loans or the Town's indirect guarantees of the Concessionaire Loans in the preliminary official statements and official statements issued in connection with these offerings.

159.    Venditto knowingly, or with reckless disregard, signed the preliminary official statement and official statement for these two offerings.

160.    In addition, Venditto knowingly, or with reckless disregard, caused the Town Attorney to sign certifications and other documents in connection with these offerings, as described in paragraphs 149 and 151 above.

### B.    Misstatements and Omissions Between December 2015 and December 2016

161.    In or about August 2015, news reports publicized the Town's indirect guarantees of the Concessionaire Loans.

162.    On or about September 8, 2015, the USAO indicted the Concessionaire on various criminal charges, including honest services wire fraud in connection with the Concessionaire Loans.  This indictment was unsealed on or about September 9, 2015.

163.    In an official statement dated on or about December 1, 2015, the Town included, for the first time, a description of the Concessionaire Loans in the "Litigation" section by stating: "The Town is aware of the potential for litigation regarding certain purported amendments to agreements with a Town concessionaire."  It also disclosed that the USAO had indicted the Concessionaire on September 8, 2015, for "provid[ing] payments and other things of value to a

Town employee in exchange for assistance in obtaining guaranteed bank loans totaling approximately $20 million." The Town asserted, however, that the "purported amendments, which were entered into without the involvement or knowledge of necessary Town officials, are unenforceable because they were never authorized by the Town's Board and are in violation of the State constitution's restriction on municipal guarantees . . . . [and] therefore create no financial obligation for the Town."

164.    In connection with the Town's next securities offering, the Town repeated these same disclosures in the "Litigation And Certain Ongoing Investigations" section of the official statement dated on or about January 29, 2016, but asserted several additional reasons why the Concessionaire's Loans were unenforceable and did not need to be disclosed in any event, including that: "Neither the Town's regular outside counsel nor senior officials recall being informed of, let alone consulted on, the purported amendments at the time they were ostensibly negotiated or executed. The purported amendments also were not maintained in the official files of concession agreements maintained by the Town Clerk."

165.    The offering documents issued in connection with the Town's subsequent two securities offerings (which occurred on or about June 23, 2016 and December 20, 2016) included similar representations about the Concessionaire Loans.

166.    The Town's offering documents for these four securities offerings—issued on or about December 2015, January 2016, June 2016, and December 2016—contained material misstatements and omissions, including the following:

a.    The statements that the amendments were entered into without the involvement or knowledge of "necessary Town officials" and/or "senior Town officials" constitute material misstatements.

b.      The statements that the amendments were "never authorized by the Town Board" constitute material misstatements and/or are rendered misleading by the Town's failure to disclose the June 2010 Resolution.

c.      The statements that the amendments are in violation of the New York State Constitution are rendered misleading by the Town's failure to disclose that the Town does not dispute that certain of the amendments in 2010 are valid and enforceable.

167.    Moreover, from approximately September 2015 to approximately December 2016, when discussing the Concessionaire Loans with prospective investors, investors, rating agencies, underwriters, municipal advisors, insurers, auditors, accounting consultants, and others associated with the Town's securities offerings and financial statements, Defendants and other senior Town officials, including the Town Attorney, continued to deny knowledge of the Town's indirect guarantees of the Concessionaire Loans, claiming instead that the Concessionaire Loans were the work of a "rogue" employee (the Deputy Town Attorney).

168.    For example, during an investor call on or about January 26, 2016 relating to the Town's January 29, 2016 securities offering, the Town told investors, prospective investors, and underwriters that the Town's agreements with the Concessionaire were the work of a "rogue" official and were likely non-blinding as they were not approved by the Town Board and were unconstitutional.

169.    In another example, on or about April 20, 2016, Venditto, the Town Attorney, and other Town officials told a rating agency that the Concessionaire Loans were "rogue."

170.    Similarly, at a financing meeting on or about May 26, 2016, Venditto, the Town Attorney, and other Town representatives told an underwriter, underwriter's counsel, and others that a "rogue" attorney had entered into the Concessionaire Loan guarantees without their

knowledge or Board approval and that the Town Attorney's signatures on the Concessionaire

loan documents were forgeries.

### C.    The Misstatements and Omissions Were Material

171.    The false and misleading statements and omissions, knowingly or recklessly made

by Defendants, were material because they presented prospective investors and investors with a

false picture of the Town's financial condition and the quality of its management.

172.    If the Concessionaire defaulted on his bank loans, the Town would be liable to

make a termination payment to the lenders almost immediately, which would represent a

significant risk to the Town's liquidity.

173.    For example, if the Concessionaire defaulted on his loans in December 2013, the

Town would have been required to make a termination payment of approximately $16 million

within 60 days—which represented approximately one-third of the Town's debt due within one

year and approximately 16% of the Town's operating budget.  The Town's general fund had

approximately $32,000 of cash at the time, clearly insufficient to cover the termination

payment—or any termination payment starting in 2011.

174.    The Town would not be able to fulfill its obligations arising from the

Concessionaire Loans unless it was successful in raising money for the termination payment

through public securities offerings.

175.    The Town, however, was not guaranteed consistent access to the public financing

markets or favorable economic terms on such financings.

176.    Indeed, in 2016, after news of the Concessionaire Loans became public and the

Town's financial condition continued to deteriorate, it became difficult for the Town to find

underwriters for its securities offerings, and investors demanded higher yields to purchase the

Town's securities.

41

177.    For example, in its offering on or about June 23, 2016 of Bond Anticipation Renewal Notes, 2016 Series D (CUSIP #: 692160NP5), due June 28, 2017, the Town paid an interest rate of 2.85%.  This interest rate was 2.35% above the Municipal Market Analytics ("MMA") index of one-year maturity AAA rated bonds, which was 0.5%.  A year earlier, the Town paid an interest rate of 0.95% to purchasers of its Bond Anticipation Notes, 2015 Series B (CUSIP #: 692160NF7), offered on or about June 25, 2015—0.66% above the MMA interest rate, which was 0.29%.

178.    Information about the Town's obligations arising from the Concessionaire Loans, the impact of those obligations on the Town's finances, and the Town's ability to fulfill those obligations was material to the Town's investors and would be material to a reasonable investor.

179.    When making investment decisions, investors in municipal securities analyze certain quantitative financial metrics, such as the municipality's liquidity, contingent liabilities, general fund balance, operating budget, debt to cash ratio, and the municipality's known or anticipated litigation.

180.    It would have been important for investors to know that the Town had contingent liabilities that could significantly impact the Town's liquidity.  This was especially true in light of the Town's poor financial condition and declining credit rating.

181.    When making investment decisions, investors in municipal securities also analyze certain qualitative factors, such as the quality of the Town's management.

182.    It would have been important for investors to know that the Town had entered into unusual agreements with a vendor and that the agreements were motivated by the political and personal interests of senior Town and Nassau County officials.

183.    Defendants' misstatements to rating agencies, insurers, and underwriters were also material.

184.    Credit rating agencies include a municipality's financial condition, liquidity, management, contingent liabilities, debt, and litigation among the significant factors they consider when assigning a rating on a municipality's securities offerings or long-term underlying credit rating.  Investors in municipal securities likewise consider the municipality's credit rating a significant factor in making a determination as to whether to purchase that municipality's securities.

185.    Insurance companies consider a municipality's financial condition, general fund balance, liquidity, management, and debt (including guarantees of third-party debt) to be significant factors when deciding whether to insure a municipality's securities offerings and at what price.  Investors in municipal securities likewise consider it relevant to their investment decisions whether a municipality's offerings are insured.

186.    Municipal underwriters take into consideration factors such as a municipality's financial condition, liquidity, quality of management, contingent liabilities, litigation, and guarantees of debt when pricing and selling a municipality's securities offerings to investors. Investors in municipal securities likewise consider relevant to their investment decision the pricing of the securities offerings, including the yield on the securities.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder
### (Against the Town and Venditto)

187.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 186, as though fully set forth herein.

188.    By reason of the foregoing, the Town and Venditto directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading, and have employed devices, schemes and artifices to defraud, and/or engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

189.    By reason of the foregoing, the Town and Venditto singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act
### (Against the Town and Venditto)

190.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 186, as though fully set forth herein.

191.    By reason of the foregoing, the Town and Venditto directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly (or, for Section 17(a)(3) of the Securities Act, negligently), have employed devices, schemes, and artifices to defraud and/or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities offered and sold by the Town.

192.     By reason of the foregoing, the Town and Venditto violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act.  [15 U.S.C. §§ 77q(a)(1) and (a)(3)].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 17(a)(2) of the Securities Act**
**(Against the Town)**

193.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 186, as though fully set forth herein.

194.     By reason of the foregoing, the Town directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly, recklessly, or negligently, obtained money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

195.     By reason of the foregoing, the Town violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act.  [15 U.S.C. § 77q(a)(2)].

**FOURTH CLAIM FOR RELIEF**
**Control Person Liability for the Town's Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5 Thereunder**
**(Against Venditto)**

196.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 186, as though fully set forth herein.

197.     At all times relevant hereto, Venditto controlled the Town for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

198.    By engaging in the conduct alleged above, Venditto is liable as a control person for the Town's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Liability for the Town's Violations of Section 10(b)
of the Exchange Act and Rule 10b-5 Thereunder
and Section 17(a) of the Securities Act
(Against Venditto)**

199.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 186, as though fully set forth herein.

200.    As alleged above, the Town violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

201.    Venditto knew, or recklessly disregarded, that the Town's conduct was improper and knowingly rendered to the Town substantial assistance in this conduct.

202.    By reason of the foregoing, Venditto aided and abetted the Town's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Liability for the Town Attorney's Violations of Section 10(b) of the
Exchange Act and Rule 10b-5 Thereunder
and Sections 17(a)(1) and 17(a)(3) of the Securities Act
(Against Venditto)**

203.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 186, as though fully set forth herein.

204.    As alleged above, the Town Attorney violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)].

205.    Venditto knew, or recklessly disregarded, that the Town Attorney's conduct was improper and knowingly rendered to the Town Attorney substantial assistance in this conduct.

206.    By reason of the foregoing, Venditto aided and abetted the Town Attorney's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter judgments and orders granting the following relief:

### I.

Permanently enjoining the Town and Venditto from committing and/or aiding and abetting the violations of the federal securities laws alleged against them in this Complaint;

### II.

Permanently enjoining Venditto from participating in an offering of municipal securities, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any municipal security;

### III.

Requiring the Town to retain and implement any recommendations made by an Independent Consultant appointed by the Court (a) to review and recommend improvements to the Town's financial reporting procedures and controls and municipal security disclosure

policies and procedures and (b) to monitor the Town's implementation of any such recommendations no less than biannually for a period of five years;

### IV.

Enjoining the Town, for a period of five years, with such exceptions as may be reasonably approved by the court, from engaging in the offer or sale of its own municipal securities unless, prior to doing so, it implements the recommendations of the Independent Consultant;

### V.

Ordering the Town and Venditto to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

### VI.

Granting such other and further relief, including equitable, as the Court may deem just and proper.

Dated:  November 21, 2017
        New York, New York

*Sanjay Wadhwa*
_____
Sanjay Wadhwa
Mark R. Zehner (not admitted in EDNY)
Charles D. Riely
Alexander M. Vasilescu
Ladan F. Stewart
Alison R. Levine
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0178 (Vasilescu)
vasilescua@sec.gov

**Appendix – Relevant Town of Oyster Bay (CUSIP #: 692160) Securities Offerings**

| Date of OS/OM[1] | Description | Maturity Date(s) | Financial Statements Attached |
|---|---|---|---|
| 7/29/2010 | $54,880,000 Bond Anticipation Notes | 8/12/2011 | FY[2] ending 12/31/2009 |
| | $126,314,000 Public Improvement Bonds | 8/15/2011-2026 | |
| 11/16/2010 | $78,600,000 Bond Anticipation Notes | 11/18/2011 | FY ending 12/31/2009 |
| | $12,500,000 Revenue Anticipation Notes | 3/18/2011 | |
| 3/2/2011 | $61,575,000 Public Improvement Bonds | 3/1/2012-2020 | FY ending 12/31/2009 |
| | $109,445,000 Bond Anticipation Notes | 3/9/2012 | |
| 5/12/2011 | $36,710,000 Public Improvement Refunding Bonds | 3/15/2013-2026 | FY ending 12/31/2009 |
| 8/3/2011 | $135,240,000 Bond Anticipation Notes | 8/10/2012 | FY ending 12/31/2010 |
| 11/9/2011 | $78,600,000 Bond Anticipation Renewal Notes | 11/16/2012 | FY ending 12/31/2010 |
| | $12,500,000 Revenue Anticipation Notes | 3/16/2012 | |
| 2/29/2012 | $153,780,000 Bond Anticipation Renewal Notes | 3/8/2013 | FY ending 12/31/2010 |
| 5/31/2012 | $13,000,000 Deficiency Notes | 6/7/2013 | FY ending 12/31/2010 |
| 8/1/2012 | $157,560,000 Bond Anticipation Notes | 8/9/2013 | FY ending 12/31/2010 |
| 10/4/2012 | $7,500,000 Bond Anticipation Notes | 10/11/2013 | FY ending 12/31/2011 |
| | $16,800,000 Revenue Anticipation Notes | 3/29/2013 | |
| 11/7/2012 | $112,995,000 Bond Anticipation Notes | 11/15/2013 | FY ending 12/31/2011 |
| 12/5/2012 | $15,000,000 Hurricane Sandy Budget Notes | 12/13/2013 | FY ending 12/31/2011 |
| 2/27/2013 | $154,010,000 Bond Anticipation Notes | 3/7/2014 | FY ending 12/31/2011 |
| 4/9/2013 | $7,500,000 General Obligation Bonds (Taxable) | 10/1/2014-2022 | FY ending 12/31/2011 |
| 8/1/2013 | $189,140,000 Bond Anticipation Notes | 8/8/2014 | FY ending 12/31/2012 |
| 10/3/2013 | $10,000,000 Revenue Anticipation Notes | 3/28/2014 | FY ending 12/31/2012 |
| 10/30/2013 | $107,095,000 Public Improvement Bonds | 11/1/2014-2027 | FY ending 12/31/2012 |
| 2/4/2014 | $52,120,000 Bond Anticipation Notes | 2/6/2015 | FY ending 12/31/2012 |
| 2/20/2014 | $140,225,000 Public Improvement Bonds | 3/1/2015-2028 | FY ending 12/31/2012 |
| 4/2/2014 | $28,680,000 Public Improvement Refunding Bonds | 7/15/2014-1/15/2028 | FY ending 12/31/2012 |
| | $40,750,000 Public Improvement Refunding Bonds | 8/15/2014-2024 | |
| 7/2/2014 | $10,000,000 Revenue Anticipation Notes | 3/27/2015 | FY ending 12/31/2012 |
| | $20,000,000 Tax Anticipation Notes | 3/27/2015 | |
| | $34,000,000 Bond Anticipation Notes | 7/10/2015 | |

[1] OS is an abbreviation for Official Statement.  OM is an abbreviation for Offering Memorandum.
[2] FY is an abbreviation for Fiscal Year.

| Date of OS/OM[1] | Description | Maturity Date(s) | Financial Statements Attached |
|---|---|---|---|
| 7/24/2014 | $170,490,000 General Obligation Bonds | 8/1/2015-2031 | FY ending 12/31/2013 |
| | $7,500,000 Bond Anticipation Notes | 2/6/2015 | |
| 12/4/2014 | $3,300,000 Bond Anticipation Notes | 12/12/2015 | FY ending 12/31/2013 |
| 1/28/2015 | $85,465,000 Bond Anticipation Notes | 2/5/2016 | FY ending 12/31/2013 |
| 5/13/2015 | $11,000,000 Revenue Anticipation Notes | 3/25/2016 | FY ending 12/31/2013 |
| | $19,000,000 Tax Anticipation Notes | 3/25/2016 | |
| 6/25/2015 | $72,200,000 Bond Anticipation Notes | 7/8/2016 | FY ending 12/31/2013 |
| 12/1/2015 | $3,300,000 Bond Anticipation Renewal Notes | 7/8/2016 | FY ending 12/31/2013 |
| 1/29/2016 | $99,075,000 Bond Anticipation Notes (Tax-Exempt) | 2/3/2017 | FY ending 12/31/2013 |
| | $22,700,000 Bond Anticipation Notes (Taxable) | 2/3/2017 | |
| 6/23/2016 | $10,000,000 Revenue Anticipation Notes | 3/31/2017 | FY ending 12/31/2014 |
| | $7,000,000 Tax Anticipation Notes | 3/31/2017 | |
| | $51,285,000 Bond Anticipation Renewal Notes | 6/1/2018 | |
| | $18,985,000 Bond Anticipation Renewal Notes | 6/28/2017 | |
| | $7,565,000 Bond Anticipation Notes (Taxable) | 2/3/2017 | |
| 12/20/2016 | $4,900,000 General Obligation Bonds (Taxable) | 10/1/2017-2022 | FY ending 12/31/2014 |
| | $15,000,000 Tax Anticipation Notes | 4/7/2017 | |

ii